**GENERAL INS. CORP. v. HUGHES et al.**

**No. 12368.**

Court of Civil Appeals of Texas.   Galveston.

May 1, 1952.

Rehearing Denied May 22, 1952.

**232**

Joe Newman, of Groveton and Cantey, Hanger, Johnson, Scarborough & Gooch, of Ft. Worth (J. Kirby Smith, of Ft. Worth, of counsel), for appellant.

Faver & Barnes and Clyde E. Barnes, all of Jasper, for appellee.

CODY, Justice.

In cause No. 9011 upon the docket of the District Court of Trinity County, J. R. Hughes, for himself and as next friend of his minor child, recovered judgment in the total principal sum of $17,750 for the death of Mrs. J. R. Hughes, which resulted from a collision between the automobile which was being driven by Mrs. Hughes, and a truck which was being driven by an employee of C. P. Hughes, who was engaged in the lumber business under the name of C. P. Hughes Lumber Company. At the time of the collision C. P. Hughes held the General Insurance Corporation's Policy NA 68023.—Following said collision said insurance company investigated its liability and obtained from C. P. Hughes the affidavit, copy of which is appended to this opinion, and concluded that it was liable on the collision coverage of the policy and has paid said coverage off, but that it was not liable under the public liability and property damages coverages of its policy, and notified C. P. Hughes that it would not defend him from liability in Cause No. 9011.

After J. R. Hughes recovered the aforesaid judgment against C. P. Hughes, the said J. R. Hughes filed this suit, being Cause No. 9182 upon the docket of aforesaid District Court, to recover under the terms of aforesaid insurance policy the amount of his aforesaid judgment, with interest, etc. C. P. Hughes intervened to recover costs incurred in defending Cause No. 9011, including attorneys' fees, etc. The issues made by the pleadings of plaintiff, intervenor and defendant insurance company were by the Court tried to a jury, and at the conclusion of the evidence the insurance company moved for a directed verdict which was refused. The cause was then submitted upon special issues. Upon the coming in of the verdict, the defendant insurance company moved for judgment notwithstanding the verdict, which was refused, and the Court rendered judgment for plaintiff J. R. Hughes for the amount of his aforesaid judgment, interest, etc. and rendered judgment, for intervenor C. P. Hughes for his costs, etc., all upon the verdict of the jury and upon the court's supplemental findings.

The defendant insurance company predicates its appeal upon 13 points and with the exception of one point, which complains of the court's refusal to define a term used in the court's charge, the defendant complains in effect that there was no competent evidence before the jury to raise any issue of fact and that the court should have rendered judgment for defendant as a matter of law.

As indicated above, it was undisputed that C. P. Hughes owned the tractor truck which was in the collision and said truck was expressly described in the policy of insurance in the schedule of the fleet of automobiles contained in said policy. It was also undisputed that said tractor truck was towing a Nabors trailer at the time of the collision, which said trailer is not expressly described in the policy of insurance. And defendant plead in its answer that liability

for public liability and property damages coverages was expressly excluded under the following language of the policy, under the heading "Exclusions", "This policy does not apply: * * * (c) under coverages A and B while the automobile is used for the towing of any trailer owned or hired by the insured and not covered by like insurance in the company; * * *." Defendant further plead that the Nabors trailer which was being towed by the tractor truck was not insured by like insurance in the company and that consequently there was no obligation on the part of defendant "to afford any of the protection benefits or furnish any defense or in any manner become liable to these plaintiffs or the plaintiff in intervention in any manner, shape or form whatsoever."

Defendant further alleged that the affidavit furnished by C. P. Hughes established that he owned the Nabors trailer which was not insured, and by causing same to be towed by an insured tractor, he excluded any coverage under public liability or property damage provisions of the policy of insurance and that it is a requirement of the policy of insurance "The insured shall cooperate with the company and, upon the company's request, * * * shall assist in * * * securing and giving evidence, * * *." And defendant plead that if said affidavit were false, the furnishing of false information did not constitute "cooperation" and defendant alleged that C. P. Hughes was estopped to deny the truth of the affidavit, and so with respect to plaintiff J. R. Hughes.

By supplemental petition plaintiff alleged that the Nabors trailer was insured under the "Temporary Substitute Automobile" provision of the policy, which provides that the word "automobile" as used in the policy means "Under coverages A, B, and X, an automobile not owned by the named insured while temporarily used as a substitute for the described automobile while withdrawn from normal use because of its break down, repair, servicing, loss or destruction" and Plaintiff alleged that the Nabors trailer was being used as a substitute for the insured Lufkin trailer while said Lufkin trailer "was withdrawn from normal use be-cause of its break down, repair, servicing, loss or destruction." Plaintiffs further alleged that C. P. Hughes did not own the trailer at the time, etc.

Plaintiffs further alleged that in the giving of all information to the defendant relative to any matters pertaining to the collision "including all information contained in the statement typed by an agent of the insurance company and signed by the said Charles P. Hughes, the assured, that he has carefully and fully informed defendant of the true facts, circumstances and conditions, and has in no way done other than to give to the defendant his full and complete cooperation, and that in the references suggesting that said Charles P. Hughes owned the said Nabors trailer involved herein, the said Charles P. Hughes fully informed the defendant as to the manner of the acquisition of said Nabors trailer and of each and all of the steps taken in the way of acquiring title to said trailer, and defendant was, therefore, as fully informed as was the said Charles P. Hughes relative to the title to the aforesaid Nabors trailer * * *."

Based upon the pleadings of the parties and upon the evidence, some of which is hereafter quoted, the court submitted to the jury special issues Nos. 1, 2 and 3, which, as answered, by the jury, read as follows:

"Issue No. 1

"Do you find from a preponderance of the evidence that the Nabors trailer involved in the collision out of which this case arose, was, at the time and place of said collision, temporarily used as a substitute for Charles P. Hughes' Lufkin trailer listed as entry 2 in the fleet schedule attached to Policy NA 68023?"

Answered "Yes."

"Issue No. 2

"Do you find from a preponderance of the evidence that Charles P. Hughes' Lufkin trailer listed as entry 2 in the fleet schedule attached to Policy NA 68023, was at the time and place of collision out of which this suit arose withdrawn from normal use because of its breakdown, or repair, or servicing, or loss or destruction?"

Answered "Yes."

"Issue No. 3

"Do you find from a preponderance of the evidence that the Nabors' trailer involved in the collision out of which this cause arose, at the time of said collision, was not owned by Charles P. Hughes?"

Answered "It was not owned by Charles P. Hughes."

The manifest purpose of the submission of the quoted special issues was to seek to establish that the use of the Nabors trailer at the time of the collision fell within the "Temporary Substitute Automobile" provision. Following the reading of the C. P. Hughes affidavit to the jury, he was asked to tell the jury again how he got possession of the Nabors trailer. The appellant at that point stated its position very clearly that no evidence could be received from C. P. Hughes which varied, changed or contradicted the matters stated in the affidavit. Appellant objected to Mr. Hughes being permitted to testify "in contradiction to anything in the affidavit for the reason that as to the rights of this company, as pleaded by us in our pleadings, those rights are established under that affidavit. If the affidavit is true, there is no coverage and, if it is false, he has violated the cooperation clause, and he had two judicial admissions that the affidavit is true; one in his deposition on file, and one in his pleadings where he set out that everything in the affidavit was true. And now he is on the witness stand being asked a question to contradict his judicial admissions and the statement furnished that established these rights."

There is little reason to confuse admissions against interest with formal judicial admissions made in the course of judicial proceedings in order to dispense with the production of evidence. See McCormick & Ray, Texas Law of Evidence, pp. 632, 640. The affidavit in question was taken by appellant's adjuster, acting in the interest of appellant, and obviously the matter contained therein was not established in the course of a judicial proceeding. If there were a deposition on file in the case, as intimated in the quoted objection, but which is not reflected by the statement of facts, it was the privilege of appellant to make such use of it as it might deem most advantageous. But even admissions made in a deposition may be explained. "The general rule prevails that when a litigant admits positive and definite facts, which if true would defeat his right to recover, and such statements or admissions are not subsequently modified or explained by him to show that he was mistaken, although testifying in good faith, he is conclusively bound by such statements or admissions. * * * Stanolind Oil & Gas Co. v. State, 136 Tex. 5, 133 S.W.2d 767; [Id. 136 Tex. 5] 145 S. W.2d 569, and authorities cited; Foster v. Woodward, Tex.Civ.App., 134 S.W.2d 417; 17 Tex.Jur., pp. 576 and 581." Pacific Fire Ins. Co. v. Donald, Tex., 224 S.W.2d 204, 208.—We have quoted enough from the supplemental petition upon which appellees went to trial to indicate that same was carefully phrased to allege full "cooperation," and to blame appellant's adjuster for the words and conclusions appearing in the affidavit. There was no judicial admission in the allegations in the supplemental petition with reference to the insured's cooperation which foreclosed Mr. Hughes from making fully known to the jury what he had made fully known to appellant's adjuster who prepared the affidavit.

As explaining the matter of his possession, Mr. Hughes testified that a man who at times did hauling for him had bought the Nabors trailer from a Mr. Preston Hughes, a cousin of Mr. Hughes, but no kin to Mr. J. R. Hughes, and that he, C. P. Hughes, became a surety on the note. He testified that in June, 1948, about five weeks after the purchaser bought the Nabors trailer, he found he was not going to be able to pay for it, and he so notified the aforesaid mortgagee and surety; that it was decided by them that the purchaser (who worked for the surety, C. P. Hughes), should leave the trailer at Mr. Hughs' place of business, until Preston Hughes, the mortgagee, and C. P. Hughes should decide how the matter was to be wound up. The trailer bore the license plates which had been issued to the purchaser when he bought it. From said testimony it further appeared that the purchaser never transferred the title, as distinguished from the

possession, out of himself, or into either the surety or the mortgagee. The trailer, in this testimony, merely remained at the place of Mr. C. P. Hughes from the time it was left there in June until in November, 1948.

The testimony was further to the effect that in November, 1948, was the first time any use of the Nabors trailer was ever made by C. P. Hughes. From his testimony it appeared that the same tractor truck was used to pull the Nabors trailer as was used to pull the Lufkin trailer, and that the two trailers were never on the road at the same time. Indeed, in substance, Mr. Hughes' testimony was to the effect when the one trailer was on the road, the other was loaded up, and that thereby the tractor truck, and its driver, could be on the road with less delay, than if only one trailer had been used. The Nabors trailer was the one being pulled by the tractor on February 18, 1949, when the collision occurred. But, according to the testimony of C. P. Hughes, the status of the ownership had remained unchanged. And it had not yet been determined by the mortgagee and the surety (C. P. Hughes) what would be done. No payment was made by the surety, none was exacted by the mortgagee. It was only after the collision that the mortgagee and the surety agreed that C. P. Hughes should pay off the note and take ownership of the Nabors trailer.

■ We have not been furnished with any citation of authority which fits the facts testified to by Mr. Hughes. No doubt the owner of personal property may abandon it. No doubt the first person who takes possession of personal property, after it has been abandoned, and meaning to acquire its ownership, becomes the owner. The testimony here is to the effect that the possession of C. P. Hughes, the surety, was taken in the interest of the mortgagee, as well as of himself, pending working out what would be done with the trailer. We cannot hold as a matter of law, under the evidence, that C. P. Hughes was the owner of the Nabors trailer at the time of the accident, or that his interest was any greater than that of a surety who was liable for the purchase money thereon.

The testimony was to the effect that both trailers were twenty-eight feet, square nose, flat-bedded trailers. That they were the same size, had the same tires, and the same brakes, the same color, the same weight, and looked to be the same trailer, only the Lufkin trailer had been used the most.

Mr. Hughes further gave this testimony:

"Q. State whether or not the Nabors trailer was put in operation on the trip when it was involved in this collision to perform the service of the Lufkin trailer. A. The same service, yes, sir.

"Q. That is what it was put out there for? A. Yes, sir.

\*      \*      \*      \*      \*      \*

"Q. I would like for you to tell the Court and jury for what length of time the Lufkin trailer was withdrawn from use when this collision occurred. A. It was withdrawn from use for service and repaired it while this—while this Nabors made the trip to Hamilton, Texas, and back.

"Q. I would like for you to state to this Court and this jury for what period of time this Nabors trailer was substituted for the Lufkin trailer when this collision occurred. A. It was substituted for the trip to Hamilton, Texas, to haul that one load of lumber with.

\*      \*      \*      \*      \*      \*

"Q. Why was your Lufkin trailer at the shop? A. Being serviced and repaired.

\*      \*      \*      \*      \*      \*

"Q. State whether or not at the time this collision took place your Lufkin trailer was withdrawn from use at that time. A. It was, in the shop

■ The evidence in this case had some probative value to go to the jury on the issues made by the pleadings of the parties and submitted under special issues Nos. 1, 2 and 3.

■ Whether or not there was "overall" evidence from which the jury might have concluded otherwise than they did in answers to special issues Nos. 1, 2 and 3, is not the question. Indeed, appellant pitched

its whole defense on the affidavit, at least in conjunction with the allegations in the supplemental petition, as constituting a judicial admission which made incompetent the testimony which was introduced in support of appellees' allegations. The question is not whether the evidence in support of the jury's answers to said special issues was against the great weight and preponderance of the evidence. No such objection has been urged by appellant, and of course it was beyond the province, and indeed, the jurisdiction of this Court, to raise such a point on appellant's behalf. We do not, therefore, hold either that the answers of the jury to said special issues were or were not against the great weight and preponderance of the evidence.

We have concluded that no reversible error has been shown and that the judgment of the court must be affirmed.

"Appendix
Bon Weir, Texas
April 12, 1949

"This is to certify that my name is C. P. Hughes and I live at Bon Weir, Texas, where I operate a saw mill and a planing mill under the name of C. P. Hughes Lumber Company. I have operated this business for several years. For several years I have owned one truck that I call a log truck, a 1940 Ford, that I have used for both local hauls and for hauling logs. This was the only truck I owned for a long time and I did not do any long distance delivering hauling until the spring of 1947. My records how that on May 1, 1947, I registered a 1947 Ford truck, motor number 799T–1497232, Lic. No. NE 1088, in Newton County Texas and a Lufkin traler with license Number TJ 8163, this being registered at the same time with the truck. I had bought this truck new from Newton Motor Company and the trailer I bought from Lufkin Trailer division of the Lufkin Foundry, Lufkin, Texas. I bought this truck-tractor and trailer to use in hauling finished lumber from my mill to yards in places like Dallas, Fort Worth, Waco and other points. Prior to the spring of 1947, I had sold all the lumber I could produce at the mill to truckers, and had not had to make any deliveries any farther away that

close to the mill. I just operated the Ford and Lufkin equipment, that is, those two unites were the only ones I did own and operate until during the middle of 1948 I boght a second trailer from Carlton Dougharty, of Newton or Bon Weir, Dougharty had bought this trailer, a Nabors trailer, from Nabors Company at Houston on May 13, 1948, new, and I and Preston Hughes, my first cousin, had gone on the note. Carlton was doing some*ing* hauling with this trailer, but not making any money, and one reason he gave for not making money was the *fat* that the insurance cost him so much money. Any way, I bought this trailer from Daugharty by paying off the mortgage that Pr3eston Hughes and I had, and I took the trailer over. One reason I bought this second trailer was so that I could load one trailer while the tractor was on the road with the other trailer, so that the tractor could stay on the road all the time, without waiting at the mill for a trailer to be loaded. I did not buy a second tractor, and I never did, and still do not have two trucks that do any hauling on the highway for distant deliveries, and I still own the two trailers, the Lufkin and the Nabors. Both theese trucks-a Both these trailers are 28 feet long dual wheel semi-trailers, float type. I have just talked with Carlton Daugharty today, and he told me that he sold me this Nabors trailer five weeks to the day after he bought it, and this would make it June 17, 1948. I know that it was about that time that I got this Nabors trailer. I remember that it crossed my mind at the time that Carlton mentioned the insurance on his trailer, that I should talk to George Wayland, who writes my insurance, and tell him to insure this Nabors trailer for me, but I did not do it and it never did occur to me again to tell my insurance agent to insure this trailer until after an accident occurred on or about February 18, 1949. However, I did not get a second tractor to use with the second trailer, and for this reason, there was not but one of these two trailers on the highway at any one time because I just used one truck to pull the two trailers. When I bought this trailer from Dougharty, I did not transfer title on the license records, or

other records, and as there had not been a license due date between the time I bought the Nabors and the wreck on February 18, 1949, the Nabors trailer was still registered in the name of Dougharty at time of the accident. On or about November 1, 1948, I bought a 1948 International truck-tractor from Squyres Truck & Implement Co., Lufkin, Texas, with motor number RED 361 26189, according to the license recei*ve* No. NH 6336 that I hold on this truck, Newton County, Tex. A short time, something like thirty days or so before I bought the International, I made a bobtail truck *Corr etc\* Correction*: About the time I bought the Inter*an*tional I started making a bog

"Received May 13, 1949
"/s/ C. P. Hughes
"(Statement of C. P. Hughes Bon Weir, Texas     April 12, 1949, Page Two.) tailed truck out of the Ford tractor, and I also had to make a tractor out of the International, so it was something like three weeks that I did nt have any truck making long delivery hauls from my mill, that is, no truck that I owned, and I had contract haulers do my hauling for me. After getting the International in shape to run, I started hauling with it like I had the Ford, letting it pull the trailers, on the road about all the time, with one trailer being loaded while the other trailer was on the road, and I still had only the one tractor for the two trailers, and therefore, only the one trailer on the highway at any one time. I guess this might have been the reason I did not remember to tell my insurance company agent to insure this second trailer. Anyway, I continued the insurance on the Lufkin trailer and still own it and have owned the Lufkin and the Nabors since buying the Nabors from Dougharty in about June, 1948. The Nabors and the Lufkin floats are the only two float trailers that I have ever owned. I own somelong hauling pole type trailers but no other float or lumber trailers. At the time of the accident in February, I owned the International and four log trucks three Fords and a GMC, but two of the log trucks that I had bought from my brother were sitting up out of service and not insured. I believe that I had all of my trucks insured with George Wayland and Brokers and General Agency, except the two sitting up that I mentioned above, for public liability and property damage coverages (that is, bodily injury and property damage coverages) at the time the accident occurred in Trinity County, Texas, on February 18, 1949. At the time of the February accident to which I have referred, James Jones, an employee of mine was returning from a trip to Hamilton, Texas, where he had delivered a load of lumber for me, and he was driving the International truck and towing the Nabors trailer. I want it understood that I thought the Nabors trailer was covered with bodily injury and property damage insurance until after the accident when it was brought to my attention that it had been overlooked being added to my insurance policy and that it was necessary for it to be added and described specifically. As mentioned on the first sheet of this statement, I had only one trailer on the road at any one time, and since I had one trailer insured, I thought that was all that was necessary. Have You read the above statement on this and one other separate sheet of paper and is it all true and correct to the best of your knowledge and belief? Yes

"/s/ C. P. Hughes
"Read over, sworn to and subscribed before me, the undersigned authority, by C. P. Hughes, this 11 day of May, 1949.
"/s/ S. F. Hughes
Notary Public in and for
"Newton County, Texas.
(Seal)     "Received May 13, 1949